JULIA FALK et al., Plaintiffs, *v.* CRYSTAL HALL, INC., et al., Defendants.

Supreme Court, Trial Term, Bronx County, May 31, 1951.

*Norman Lustig, Daniel A. Novok* and *Louis Helfenstein* for Crystal Hall, Inc., defendant.

*William M. Keiley* for Sinram Bros., Inc., defendant.

*George I. Swetlow* for plaintiffs.

MATTHEW M. LEVY, J. In March of 1946, Crystal Hall, Inc., owned and operated a multiple dwelling in a congested city residential neighborhood. The front of the premises was adjacent to a grass plot which separated the building line from the sidewalk and the curb. The lawn was surrounded by an open wire fence, patched up in various places, and affixed to posts or uprights on each corner of the plot. The wire was of the thickness of one's little finger.

At about noon of March 5th, a truck owned and operated by Sinram Bros., Inc., was engaged in delivering coal to the Crystal premises. The truck driver backed up the coal truck and — the better to chute the coal down to the cellar bin — mounted the sidewalk in front of the apartment house, and broke down a portion of the wire fence enclosing the grass plot in front of the house. Approximately twelve to fourteen feet of the wire fence were knocked down, with the result that the left side of the fence remained attached to one post, while the wire was detached from the upright on the right side. The fence wire lay on the grass plot between the sidewalk and the house. The truckman proceeded to deliver the coal, and, when the delivery was complete, he received payment therefor from the Crystal superintendent and drove away. The Sinram employee did not repair the broken wire fence, but simply left it where the truck had knocked it down — on the grass plot. The Crystal superintendent observed all this at the time; nevertheless, neither he nor anyone else on Crystal's behalf or otherwise removed or repaired the broken wire fence, and, on the contrary, let it remain in the position where it was after the truck driver left.

Two days later — fifty-five hours later, to be precise — at about 7:00 in the evening of March 7th, Mrs. Julia Falk, a tenant in the Crystal apartment house, left her dwelling, walked out of the hallway of the house and onto the sidewalk, took a few steps, suddenly became tangled in the broken wire (which was then lying on the sidewalk in front of the building), fell to the ground, and sustained resulting injuries.

Mrs. Falk and her husband sued both Crystal and Sinram in negligence and nuisance. Crystal, as part of its answer to

the main suit, served a cross complaint upon Sinram, alleging that the accident was due solely to Sinram's conduct and that if plaintiffs recover against Crystal it should be made whole by Sinram.

The issues were tried before court and jury. In connection with the claim of the plaintiffs against the defendants, the jury were instructed, among other matters, with respect to the contributory negligence of Julia Falk, the negligence of each defendant, and the creation or maintenance of a nuisance by each defendant.

Then the jury were fully instructed with reference to the cross complaint interposed by Crystal against Sinram. I charged the jury, in effect, to consider whether or not Crystal had knowledge (actual or constructive) of the fact that the wire fence was broken, and that, if Crystal had such notice, whether it had a reasonable opportunity to remove or repair the broken wire fence. If so, I held that there could be no recovery over against Sinram. The jury were instructed that if, on the other hand, Crystal did not have a reasonable opportunity to remove or repair the offending fence wire, then they must find for Crystal against Sinram. I charged the jury further that Crystal owed a duty to use reasonable care, under all the circumstances and in the light of its information and knowledge, to keep its premises in good condition so as to avoid injury to others, and that it could not sit idly by, even though Sinram was the original creator of the condition, and say: " I won't fix the situation. Sinram did it. I'll wait until Sinram fixes it, no matter how long it takes or how hazardous the condition is."

Crystal requested the court to charge that if the jury found in favor of the plaintiffs against both defendants on the main case, then — " the coal company, Sinram, being the active tort feasor, and the property owner, Crystal, being only a passive tort feasor," — the jury must necessarily find a verdict in favor of the defendant Crystal against the defendant Sinram on the cross complaint. I refused to charge as requested, and exception was taken by the defendant Crystal.

The jury rendered a verdict in favor of the plaintiffs against both defendants, and in favor of Sinram on the cross complaint of Crystal. Each defendant moved to set aside the verdict in plaintiffs' favor. These motions were denied when made. There was no doubt in my mind as to these determinations. The defendant Crystal also moved to set aside the verdict in Sin-

ram's favor on the cross complaint, and for judgment, notwithstanding the verdict, in Crystal's favor against Sinram. Decision was reserved on this motion, as the question here seemed more difficult, and I shall now endeavor to dispose of it.

Crystal argues that the verdict must be set aside as inconsistent — since the verdict in plaintiffs' favor against both defendants necessarily imported a primary obligation upon Sinram as having originally created the condition and only a secondary liability upon Crystal for having subsequently permitted that condition to continue for an unreasonable length of time, and therefore there was *ipso facto* liability on Sinram's part to indemnify Crystal. The kernel of the argument, as presented by Crystal, is that the '' active '' wrongdoer must respond in damages to the '' passive '' wrongdoer. Agreeing with Crystal, in principle, that, if Sinram alone were '' active,'' Crystal would be entitled to recover over on the cross complaint against it, Sinram contends that, since Crystal has '' had *actual,* rather than merely *constructive,* knowledge of the existence of the dangerous condition, Crystal has not sustained its burden of proof with respect to showing freedom from active negligence, and accordingly is not entitled to judgment over on the cross complaint.''

The language of the cases supports in some measure the language of the argument. The authorities on the subject are collected in a recent article entitled '' Indemnity Between Tort-Feasors: An Evolving Doctrine in the New York Court of Appeals '' (Meriam and Thornton in 25 New York University Law Review 845–862, October, 1950). To cite the cases here would be an act of supererogation.

Perhaps the understandable doctrine of comparative negligence — foreign to the common law of New York as between plaintiff and defendant — struggling to obtain a foothold in our jurisprudence, has found a surreptitious opportunity for expression in controversies as between one defendant and another. Thus, the legal jargon of '' active '' and '' passive,'' and '' actual '' and '' constructive,'' — and at times, equating one with the other — may well have been the juridical implements with which to project the moralistic theory of degrees of negligence and of culpability. The assumed thesis is, first, that it is obviously violative of natural justice to preclude any recovery whatsoever simply because a plaintiff's comparatively minor negligence contributed in the slightest degree to an accident occasioned largely by the grievous carelessness of a

defendant; second, that unfortunately, the obnoxious rule is so well established in our law that legislative action, all too sluggish, is necessary to abrogate it; and third, that there is certainly no justification for judicial extension of the rigid and unjust common-law doctrine beyond its pristine sphere to the newly developed field of indemnity in the ever-growing internecine strife between codefendants.

It would seem to be natural justice that a factual situation resulting in liability to third persons for passive negligence, imposed by common-law principles, should be transformed into active negligence barring indemnity where the existence of a danger causing injury comes to the knowledge of the one seeking recovery over. True, in one sense, Sinram " did " and Crystal " did not " — and thus, loosely, we may say that Sinram was " active " and Crystal " inactive." But, *after* the breaking down of the wire fence, there was abandonment by both of the hazardous wire on the loose. And, moreover, to the factual or presumed knowledge of Crystal, the dangerous *status quo* was permitted to remain for more than two working days, until Mrs. Falk's feet became entangled in the wire on the sidewalk. With notice of the condition the owner here not only did nothing, but knowingly permitted it to remain. The duty of the owner not to create danger, and the duty not knowingly to permit it to continue, normally and morally, impose equal liability. Thus, the answer to the question whether there is such factual and moral disparity between the respective acts of wrongdoing of Crystal and of Sinram justifying denomination of the negligence of one as passive and of the other as active, and warranting indemnity in favor of the former, must be in the negative. It cannot be said that Crystal has established that it was no more than passively negligent or that Sinram was a primary, as distinguished from an initial, wrongdoer. Regarding the situation as it existed when Sinram left the scene, as the court must do, the conclusion is inevitable that there was concurrence by Crystal with actual knowledge in the Sinram negligence which produced the injury. There was on the part of both defendants affirmative participation in the sense of failure to perform duty, and thus there was physical connection with the danger, rendering them *in pari delicto*.

Undoubtedly, this proposition may satisfy some. However, since the cases involving indemnity between wrongdoers demonstrate a development of broadening scope (in addition to the authorities collated in the New York University Law Review

article heretofore referred to, see, also, Reporters' Notes on Restatement, Restitution, § 95; *Sheffield* v. *Yager,* 287 N. Y. 604; *Blousman* v. *Weil,* 275 App. Div. 384; *Secor* v. *Levine,* 273 App. Div. 899, and *Morgan Warehouse & Commercial Co.* v. *Gilbert Mfg. Co.,* 60 S. W. 2d, 1053 [Tex.]), I desire to go beyond the matter of fictions and semantics, even though the words and the symbols may cloak principles of moral and natural justice striving for justifiable recognition. The unanalyzed terminology of " active " and " passive " conduct and of " actual " and " constructive " notice results, I fear, in beclouding the crucial issue. The phrasing shows what confusion will arise if we attempt to fit specific cases into the bare cubicles of easy nomenclature. Confusion made worse confounded is apparent from the fact that the principal authorities are relied upon with equal vigor by each antagonist. Whatever the answer, I did not, at the trial, and still cannot, rest my determination on a simple exercise in verbiage.

It was on the broad basis of public policy that I held at the trial, and I here reiterate, that the property owner who knowingly permitted the defective condition to remain cannot obtain indemnity from the coal company who created the defective condition. It seems to me that public policy demands that the property owner repair with reasonable promptness, and not remain insensible to the danger and detriment of the public. Merely pointing an accusing finger at the person who actively created the danger may be spiritually satisfying as a species of self-righteous indignation for the complacently inactive. But I believe the public interest would be better served if the owner of premises previously safe, and now converted (even by another) to traps and nuisances, were required to minimize the danger to the members of the public. It is obvious, to me at least, that the recognition and enforcement of such a moral and legal duty would clearly produce a highly desirable social result.

I cannot sanction a premium for inaction when duty to the community demands affirmative attention. If a cross claim were allowed in the present circumstances, property owners would be able to feel that they need not promptly remedy a known dangerous situation, because even if an innocent pedestrian were critically injured and sued the property owner, the latter need fear no actual monetary loss since he could successfully cross-claim against the original wrongdoer. If the landlord's responsibility to the community — to maintain his property in such a condition that it shall not become dangerous to the traveling

public (*Callanan* v. *Gilman*, 107 N. Y. 360; *Rohlfs* v. *Weil*, 271 N. Y. 444; *Appel* v. *Muller*, 262 N. Y. 278) — is to be adequately enforced, that responsibility must, in my view, be nondelegable even to the creator of the defective condition. In the balance of interests between the knowing property owner and the innocent traveler, I would require the property owner promptly to repair the condition and remove the danger, relegating him to a cause of action against the original creator of the condition for the property damage. The liability of the initial wrongdoer for such damage, coupled with his direct financial responsibility to the injured third person, should suffice as a caveat to protect the owner's property from the careless acts of wrongdoers.

Similarly, whatever the language of some of the opinions, there is no justifiable distinction in principle, between " actual " and " constructive " notice as a differentiating basis for disallowing or permitting indemnity. As a matter of public policy, should it make any substantial difference on the issue of legal liability or of the right to indemnity, (1) whether Crystal's superintendent personally saw Sinram's truck trample down the wire fence, or (2) whether, not having been on the scene, he had learned of it later, or (3) whether it was not shown that he was aware of it at all, but the wire remained down some days or weeks or months, and that in the exercise of reasonable care he should have known of it? I think not. In each of these situations, there is the same duty to repair — with legal liability springing from the breach of that duty. And the physical truth is that, if in fact there be nonrepair, the superintendent is nonetheless passive when he does nothing after he knows, than when he does nothing after he should have known.

If a cross complainant may be successful only when he does not have personal knowledge of the danger, a premium here is placed upon ignorance — again to the detriment of the public interest. One's normal economic urge to inspect or inquire as to the condition of one's own property may become dulled or dormant if recovery-over is to be defeated by the existence of personal knowledge. The laws should aid, not penalize, the vigilant. At the point where there is adequate opportunity to learn of the situation and to repair the defect, there should arise the resultant duty promptly to remedy — and at that point constructive notice is, I think, on a par with actual knowledge. I do not mean to say that knowledge — direct or inferred — is not a requisite. I do say that assuming that there is reasonable time within which to ascertain and to correct, it is immaterial whether the notice is one or the other.

In thus giving expression to the thesis that the " prophylactic factor of preventing future harm " (Prosser on Torts, p. 27) should be the fundamental basis for the solution of the present problem, I think I should say that the precedents, if carefully examined and thoroughly understood, generally support the principle upon which I rely, although they do not spell out these matters of public policy.

" Perhaps more than any other branch of the law, the law of torts is a battleground of social theory." (Prosser on Torts, p. 15.) That the interests of society in general are of definite concern, even in that limited interstitial sphere in which the courts may permissibly legislate, has become more and more recognized in the development of our jurisprudence (Bohlen, " Fifty Years of Torts ", 50 Harv. L. Rev. 725, 1225 [1937]; Winfield, " Public Policy in the English Common Law ", 42 Harv. L. Rev. 76 [1928]). Dean Prosser, in discussing the factors affecting tort liability, points out that in balancing the individual and social interests involved, the courts have been influenced by a number of considerations, among which is the possible prevention or minimization of future torts. " The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive." (Prosser on Torts, pp. 27–28.) For present purposes, under the facts of this case, holding that Crystal cannot escape liability — by obtaining indemnity from Sinram — is the "incentive" which is the needed ingredient of the desired " prophylactic factor ".

The principle to be applied is expressed in the American Law Institute Restatement of the Law of Restitution (ch. 3, § 95, p. 415): " Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition."

Usually, the legal principle may be applied to the facts in a particular case with relative ease and certainty. At times the

application is debatable and vexing. In the circumstances presented by the case at bar, the motion of the defendant Crystal to set aside the jury's verdict on the cross complaint must be denied. There was no error in the charge, and, under the jury's verdict, justice precludes recovery over — and that is true, whether we rely upon the doctrine that actual knowledge plus inaction equals active negligence, or upon the philosophy of natural justice and equal culpability, or upon the mandates of public policy.